Meriel L. Darzen (OSB # 113645)
Alexandria E. Dolezal (OSB # 223924)
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
meriel@crag.org | alexandria@crag.org
(503) 525-2725

Nicholas S. Cady (OSB # 113463)
Peter D. Jensen III (OSB # 235260)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
nick@cascwild.org | peter@cascwild.org
(541) 434-1463
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# DISTRICT OF OREGON
# MEDFORD DIVISION

| | |
|---|---|
| **KLAMATH-SISKIYOU WILDLANDS CENTER, CASCADIA WILDLANDS,** and **OREGON WILD**,<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES BUREAU OF LAND MANAGEMENT**<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Environmental Matters – Violations of Federal Land Policy and Management Act; Administrative Procedure Act) |

**NATURE OF ACTION**

1. Plaintiffs Klamath-Siskiyou Wildlands Center, Cascadia Wildlands, and Oregon Wild (collectively "Plaintiffs" or "KS Wild") challenge the Bureau of Land Management Medford District's ("BLM") ("Defendant") authorization of the Rogue Gold Forest Management Project ("the Project") Finding of No Significant Impact ("FONSI") and Decision Record ("DR"). Defendants acted arbitrarily, capriciously, and contrary to the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, by approving the Project.

2. This case is a challenge to the BLM's authorization of intensive logging in Late-Successional Reserves ("LSR") that impermissibly delays the development of spotted owl habitat. Not the entire project involves the intensive LSR logging at issue in Plaintiffs' suit; therefore, Plaintiffs request relief narrowly tailored to remedy the specific violation of law set forth and alleged herein.

3. This action seeks: 1) a declaration that the BLM violated FLPMA by authorizing the Rogue Gold Forest Management Project which is inconsistent with the applicable Resource Management Plan; 2) the partial vacatur and remand of the relevant commercial logging portions of the Rogue Gold Environmental Assessment ("EA"), FONSI, and DR, and any timber sales or projects authorized pursuant to and/or relying on the challenged portions of the Rogue Gold DR and EA; and 3) any other relief the Court deems appropriate.

4. Plaintiffs are not seeking relief regarding the portions of the Rogue Gold Project that involve less intensive restoration-focused logging.

5. The requested relief is necessary to preserve the status quo, to prevent illegal agency action, and to forestall irreparable injury to the environment.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—2

6. Should Plaintiffs prevail, Plaintiffs will seek attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1346 and 1331 because this action involves the United States as a defendant and arises under the laws of the United States, including FLPMA and the APA, and applicable regulations.

8. A present, actual, and justiciable controversy exists between the parties. The requested relief is, therefore, proper under 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 2201–2202.

9. Plaintiffs have exhausted their administrative remedies by timely participation throughout the Rogue Gold planning process. The challenged agency actions are subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706. Defendant has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Project area is located within this judicial district. Defendant maintains an office in this judicial district.

11. This case is properly filed in the Medford Division pursuant to Local Rule 3-2 because the Project area is located in Jackson County and the BLM's office where the Rogue Gold decision was signed is located in Jackson County. The events and omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Medford Division.

\
\
\
\
\
\
\

## PARTIES

**Plaintiffs**

12. Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic non-profit corporation organized and existing under the laws of the State of Oregon. KS Wild's main office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and northwest California. KS Wild uses environmental law, science, education, and collaboration to help build healthy ecosystems and sustainable communities. Through its campaign work, KS Wild strives to protect the last wild areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in protecting Oregon's public lands and forests, and routinely participates in commenting, monitoring, and litigation affecting public lands in Oregon. KS Wild is a membership organization and has members and staff who would be irreparably injured by the implementation of the Rogue Gold Project.

13. Plaintiff CASCADIA WILDLANDS is an Oregon non-profit organization based in Eugene, Oregon. Representing over 12,000 members and supporters, Cascadia Wildlands is devoted to the conservation of the Cascadia Bioregion, which extends from northern California to southeastern Alaska. Cascadia Wildlands uses a combination of education, organizing, outreach, litigation, advocacy, and collaboration to defend wild places and promote sustainable, restoration-based forestry. Cascadia Wildlands' members use the Project area for a variety of professional and personal pursuits including viewing threatened and endangered species and

their habitat. Implementation of the Rogue Gold DR would irreparably harm the interests of Cascadia Wildlands and its members.

14. Plaintiff OREGON WILD is a non-profit corporation with approximately 20,000 members and supporters throughout the state of Oregon and the Pacific Northwest. Oregon Wild and its members are dedicated to protecting and restoring Oregon's lands, wildlife, and waters as an enduring legacy. Oregon Wild members use the Project area for hiking, recreation, bird watching, nature appreciation, and other recreational and professional pursuits. Implementation of the Rogue Gold DR would irreparably harm the interests of Oregon Wild and its members.

15. Plaintiffs have organizational interests in the proper and lawful management of the public lands managed by the Medford District BLM. Plaintiffs have actively participated in the Rogue Gold administrative processes by reviewing BLM proposals and documents, conducting field exams, and submitting timely written comments regarding proposed BLM management activities.

16. Plaintiffs and their members, supporters, and staff would sustain injury to their aesthetic, educational, recreational, spiritual, and scientific interests if the Rogue Gold Project proceeds as authorized. Plaintiffs and their members, supporters, and staff have concrete plans to return to the area where the timber harvest is located. Unless this Court grants the requested relief, Plaintiffs and their members, supporters, and staff will be adversely and irreparably harmed by the logging of old-growth forest stands located within the Project area.

**Defendant**

17. Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the United States Department of the Interior and is charged with managing

public lands and resources in accordance and compliance with federal laws and regulations. It issued the Rogue Gold EA, FONSI, and DR authorizing the Project and associated timber sales.

## LEGAL BACKGROUND

**Administrative Procedure Act (APA)**

18. The APA confers a right of judicial review on any person adversely affected by agency action within the meaning of a relevant statute. 5 U.S.C. § 702. Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review. 5 U.S.C. § 704.

19. Upon review under the APA, a court shall "hold unlawful and set aside agency action * * * found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law * * *." 5 U.S.C. § 706(2).

**Federal Land Policy and Management Act (FLPMA)**

20. Congress enacted the Federal Land Policy and Management Act in 1976, in part "to provide for the management, protection, development, and enhancement of the public lands." Pub. L. 94-579; *see also* 43 U.S.C. § 1701 *et seq.* Congress enacted FLPMA to ensure that the present and future use of public lands be "projected through a land use planning process[.]" 43 U.S.C. § 1701(a)(2). In enacting FLPMA, Congress expressed its belief that our public lands should "be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values[.]" 43 U.S.C. § 1701(A)(8).

21. FLPMA requires the BLM to develop land use plans called "resource management plans" ("RMPs") that govern the use of the land BLM manages. *See* 43 U.S.C. § 1712. Once a resource management plan has been developed, the BLM is required to manage its

lands in compliance with the plan and ensure that any site-specific projects conform to the RMP. 43 U.S.C. § 1732; 43 C.F.R. § 1610.5-3(a).

22. The BLM issued the Southwestern Oregon RMP for the Medford BLM District in 2016. The final 2016 Southwestern Oregon RMP ("2016 RMP") applies to the timber sales authorized by the Rogue Gold Forest Management Project.

23. The 2016 RMP allocates varying amounts of land to six different land use categories, including Late-Successional Reserves, Riparian Reserves, and the Harvest Land Base.

24. The Late-Successional Reserves are managed to, *inter alia*, develop, maintain, and promote northern spotted owl nesting, roosting, and foraging habitat.

## FACTUAL AND ADMINISTRATIVE BACKGROUND

**Northern Spotted Owls and Their Habitat**

25. The northern spotted owl ("NSO") (*Strix occidentalis caurina*) is a medium-sized, dark brown owl with a barred tail, white spots on the head and breast, and dark brown eyes surrounded by prominent facial disks.

26. The NSO occupies late-successional and old-growth forest habitat from southern British Columbia through Washington, Oregon, and California as far south as Marin County, including within the Rogue Gold planning area.

27. Spotted owls rely on older forest habitats because they generally contain the structures and characteristics required for the owl's essential biological functions of nesting, roosting, foraging, and dispersal. These structures include a multi-layered and multi-species tree canopy dominated by large overstory trees; moderate to high canopy closure; a high incidence of trees with large cavities and other types of deformities; numerous large snags; an abundance of

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—7

large, dead wood on the ground; and open space within and below the upper canopy for owls to fly. Forested stands with high canopy closure also provide thermal cover as well as protection from predation. This habitat is known as nesting, roosting, and foraging ("NRF") habitat.

28. Due to concerns over widespread habitat loss and modification as well as the lack of regulatory mechanisms to protect the species, the U.S. Fish and Wildlife Service ("FWS") listed the northern spotted owl as "threatened" under the Endangered Species Act on June 26, 1990. 16 U.S.C. § 1533(a); Determination of Threatened Status for the Northern Spotted Owl, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

29. In 2020, FWS determined "that reclassification of the northern spotted owl from a threatened species to an endangered species is warranted" due to stressors acting on the species and the species' accelerating population decline. 85 Fed. Reg. 81,144, 81,144–46 (Dec. 15, 2020).

30. FWS designated critical habitat for the species in 1992 and revised in 2008. *Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Final Rule*, 73 Fed. Reg. 47,325 (Aug. 13, 2008). A draft revised northern spotted owl critical habitat rule was published on March 8, 2012, and finalized on December 4, 2012. Endangered and Threatened Wildlife and Plants; Revised Critical Habitat for the Northern Spotted Owl: Final Rule, 77 Fed. Reg. 71,876 (December 4, 2012).

31. The Rule describes NSO habitat as follows:

> typically include a moderate to high canopy cover (60 to over 80 percent); a multilayered, multispecies canopy with large (greater than 30 in (76 cm) dbh) overstory trees; a high incidence of large trees with various deformities (e.g., large cavities, broken tops, mistletoe infections, and other evidence of decadence); large snags; large accumulations of fallen trees and other woody debris on the ground; and sufficient open space below the canopy for northern spotted owls to fly.

77 Fed. Reg. 71,905.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—8

**The 2016 RMP**

32. The 2016 Southwestern Oregon RMP ("2016 RMP") provides overall direction for the management of all natural resources on BLM-administered lands in southwestern Oregon, including the lands at issue here.

33. The 2016 RMP contains management directions for different land use allocations. Those land use allocations include two main categories: the Harvest Land Base ("HLB") where commercial logging is the focus, and reserve allocations, such as Late-Successional Reserves ("LSR"), where the focus is on forest conservation and the retention of late-successional wildlife habitat.

34. Specifically, LSRs are managed to develop, maintain, and promote northern spotted owl nesting, roosting, and foraging habitat.

35. Contribution to the allowable sale quantity ("ASQ") (filling commercial timber quotas) is not a described purpose of LSR forest management.

36. The LSR land use allocation has management directions and objectives to protect stands of older, structurally complex conifer forests; maintain habitat for the NSO and marbled murrelet; and promote the development of habitat for the NSO in stands that do not currently meet suitable habitat criteria.

37. In southern Oregon, NSO nesting-roosting habitat consists of conifer stands with a multi-layered, multi-species canopy dominated by larger conifer overstory trees, canopy cover $\geq 60$ percent, overstory tree diameter of $\geq 21$" diameter at breast height (dbh), > 12 trees with 20" or greater dbh trees/acre, quadratic mean diameter ("QMD") > 15" dbh, basal area from 180 to 240 ft3/acre (most often greater than 240 ft3/acre), and a basal area from larger trees of > 30ft3 for trees > 26" dbh.

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—9

38.     Sixty percent canopy cover is the minimum canopy cover requirement for NSO nesting-roosting habitat.

39.     Logging is permitted within the LSR "to speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term."

40.     However, such logging is prohibited if it precludes or delays by 20 years or more the development of NSO nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment.

**The Rogue Gold Forest Management Project**

41.     On September 23, 2021, BLM initiated the "scoping period" for the Rogue Gold Vegetation Management Project. In the Scoping Notice, BLM identified 2,052 acres to be considered for commercial timber harvest.

42.     The notice states that the harvest is necessary because "[t]he stands identified for potential treatment are overstocked, resulting in stand conditions that are less resilient and less productive" and "lack structural complexity and do not contain multiple layers, which is a key component of habitat function for several wildlife species, such as the northern spotted owl."

43.     On June 23, 2023, BLM released its Draft Environmental Assessment (EA) for the Rogue Gold Project and solicited comments from the public.

44.     On July 13, 2023, KS Wild submitted comments on behalf of itself as well as Cascadia Wildlands and Oregon Wild raising concerns about the BLM's plans to commercially and intensively log within designated LSR Land Use Allocation (LUA) units.

45. Plaintiffs expressed concern that BLM's approach would lead to functional mature forests being logged, exacerbating fire risks in the region, and degrading and downgrading late successional wildlife habitat within protected reserves.

46. Plaintiffs specifically took issue with the more intensive logging prescriptions proposed in the reserves. Plaintiffs were concerned that BLM's heavier proposed logging would downgrade or remove forest that currently provides the habitat and ecosystem benefits associated with NSO habitat.

47. BLM authorized the Rogue Gold Forest Management Project, publishing the Final EA, FONSI, and DR on August 24, 2023.

48. There, the agency acknowledged it "received comments from the public that disagreed with the implementation of treatments in the LSR LUA, but the Rogue Gold project is following, and tiering to, the management direction identified for LSR LUA and analyzed in the action alternative of the 2016 PRMP/FEIS."

49. The EA purports to analyze the 57,570-acre Planning area and the DR authorizes activities across 17,782 acres of BLM-administered lands within Jackson County, Oregon between Rogue River, Gold Hill, and Jacksonville Oregon.

50. The treatment area is home to many special-status fish, wildlife, and plant species and their habitat. It also includes popular recreation areas for sightseeing, exploration, hunting, birdwatching, hiking, camping, off-road vehicle use, and other recreation.

51. BLM authorized this Project because "[t]here is a need for the Medford District to meet the declared annual Allowable Sale Quantity (ASQ)" and a need "to reduce stand susceptibility to disturbance like fire, windstorm, disease, and insect infestation in Southwest

Oregon's dry mixed conifer forests by implementing selection harvest, activity fuels, and understory reduction treatments across all Land Use Allocations (LUAs)."

52. To achieve these goals, BLM authorized the "Selected Alternative," which approves commercial harvest activities on BLM-administered lands from Alternatives 2, 3, and 4, as described in the Rogue Gold EA.

53. Alternative 4 will result in post-harvest relative densities ("RD") ranging from 20 to 45 percent stand average RD. Alternative 4 authorizes logging stands down to 20 percent RD and converting up to 25 percent of the stand into "group selection openings."

54. Group selection openings are areas of nearly total tree removal. Such areas are commonly referred to as clearcuts. Group openings larger than an acre generally do not serve any ecological purpose because naturally occurring openings are usually under an acre in size. Larger group openings are instead created to facilitate new forest regeneration so that the area can be continually logged over time.

55. To evaluate the effects of this logging on NSO habitat within the LSR, BLM conducted modeling to determine how long it would take for stands treated under each respective alternative to function as NSO nesting-roosting habitat post-treatment.

56. BLM used stand metrics such as canopy cover, basal area, tree size, trees per acre, and canopy layering to describe and define NSO habitat and then used these metrics to determine when the analyzed stands would develop into nesting-roosting habitat after treatment, compared to no treatment.

57. BLM modeling for the Project demonstrates its proposed higher intensity logging would impact forest conditions such that stands would no longer function as NSO nesting-roosting habitat for decades post-treatment.

58. BLM's models and conclusions identify that Alternative 4, incorporated in the "Selected Alternative," would delay by 20 years or more the development of NSO nesting-roosting habitat in the stand and in adjacent stands, as compared to development without treatment.

59. Units were selected for Alternative 4 treatments because of their potential to best generate timber volume.

60. The DR for the Project authorized treatments described in Alternative 4 within the LSR.

61. Generating timber volume is not a permissible objective for logging within the LSR.

## CLAIM FOR RELIEF

**FLPMA Compliance: The Rogue Gold EA, DR, and FONSI are inconsistent with the RMP management direction governing logging in LSR.**

62. Plaintiffs reallege and incorporate all preceding paragraphs herein by reference.

63. Pursuant to the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1732(a) and its implementing regulations, 43 C.F.R. § 1610.5-3(a), BLM must ensure that a site-specific project conforms to the governing Resource Management Plan.

64. The 2016 RMP governs the Rogue Gold Project.

65. The 2016 RMP requires that logging in the LSR within non-nesting-roosting stands "speed the development of northern spotted owl nesting-roosting habitat or improve the quality of northern spotted owl nesting-roosting habitat in the stand or in the adjacent stand in the long term."

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—13

66. Logging within the LSR in stands that are not currently functioning as nesting-roosting habitat is prohibited by the RMP if it would preclude or delay the development of nesting-roosting habitat by more than 20 years, as compared to development without treatment.

67. In authorizing the Rogue Gold Project, BLM approved logging in non-nesting-roosting stands in the LSR that will delay the establishment of nesting-roosting habitat conditions by more than 20 years compared to no treatment.

68. The BLM's decision to approve, as part of the Rogue Gold Project, logging that is inconsistent with RMP requirements violates FLPMA and is arbitrary, capricious, an abuse of discretion, and is otherwise not in accordance with law. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and issue the following relief:

A. Declare that the Rogue Gold Forest Management Project Environmental Assessment and associated Decision Record and Finding of No Significant Impact violate FLPMA and its implementing regulations because they are inconsistent with the applicable Resource Management Plan;

B. Declare that the issuance of the Rogue Gold Forest Management Environmental Assessment and associated Decision Record and Finding of No Significant Impact is arbitrary, capricious, and an abuse of agency discretion, and contrary to law, in violation of Section 706(2)(A) of the APA;

C. Vacate and set aside the Alternative 4 LSR portions of the Rogue Gold Forest Management Project Environmental Assessment and associated Decision Record and Finding of

No Significant Impact and remand the matter to the BLM until such time as the agency demonstrates to this Court that it has adequately complied with the law;

   D. Enjoin the BLM and its contractors, assigns, etc., from implementation of the Alternative 4 LSR portions of the Rogue Gold Environmental Assessment and associated Decision Record, Finding of No Significant Impact, and any associated timber sales;

   E. Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including reasonable attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act and/or other applicable statutes; and

   F. Grant Plaintiffs such additional relief as this Court deems just and proper.

DATED this 27th day of March, 2024.

Respectfully submitted,

/s/ Nicholas Cady
Nicholas S. Cady (OSB # 113463)
Peter D. Jensen III (OSB # 235260)
Cascadia Wildlands
P.O. Box 10455
Eugene, Oregon 97440
nick@cascwild.org | peter@cascwild.org
(541) 434-1463

Meriel L. Darzen (OSB # 113645)
Alexandria E. Dolezal (OSB # 223924)
CRAG LAW CENTER
3141 E. Burnside St.
Portland, Oregon 97214
meriel@crag.org | alexandria@crag.org
(503) 525-2725
*Attorneys for Plaintiffs*

COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF—15